**STOUMEN**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

**No. 11086.**

United States Court of Appeals Third Circuit.

Argued Oct. 5, 1953.

Decided Dec. 8, 1953.

Rehearing Denied Dec. 31, 1953.

**904**

Morris Wolf, Philadelphia, Pa. (Morris H. Goldman, Wesley H. Caldwell, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., on the brief), for petitioner.

S. Dee Hanson, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before BIGGS, Chief Judge, and Mc-LAUGHLIN and STALEY, Circuit Judges.

STALEY, Circuit Judge.

This is a petition for review of a decision of the Tax Court which sustained the Commissioner's deficiency assess-

ments in petitioner's income taxes for the years 1943, 1944, and 1945.[1]

Petitioner, Bernard Stoumen, and his brother Abraham were equal partners in the firm Fairplay Knitting Mills, engaged in the manufacture and jobbing of knit goods. During the times which concern us here, petitioner's principal duties consisted of expediting shipments to the firm and working in the shipping end of the business. He did not handle the books and knew nothing of their details, Abraham being the managing partner and responsible for the firm's finances. Samuel Schwartz, petitioner's brother-in-law and an employee of the firm, did the buying for the business and supervised mill operations.

For the taxable years in question, Abraham had an accountant audit the firm's records and determine its income. Using the information obtained from that accountant, another accountant made up the firm's and petitioner's income tax returns. Petitioner's returns showed his full share of partnership income as reflected by the firm's books. It was learned in 1946, however, that Abraham and Schwartz had engaged in transactions which did not appear on the books.

In February and May of 1943, at Abraham's direction, Schwartz opened checking accounts in his own name in two New York banks. During the three years involved, Schwartz deposited about $410,000 in the two banks by the checks of six business concerns with whom Fairplay had dealt. The transactions, though somewhat varied in detail, were generally along the following and closely similar lines: Wool and yarn belonging to the partnership were shipped to various mills. The yarn was there processed or dyed and was then shipped to the ultimate purchaser, one of whom was Goodwear Knitting Mills, under invoices rendered in Schwartz's name. Payments were made by checks, payable to Schwartz, which were deposited in the New York accounts. Schwartz had the

---

1. The Tax Court's memorandum opinion is not officially reported.

exclusive right to draw on these accounts and, by mid-May of 1946, had withdrawn almost $400,000. The balance, with some minor corrections, remains, the accounts being dormant. About $200,000 of the withdrawals was in cash and some $68,000 was in unidentified checks. None of the checks were payable to petitioner, and he received none of the cash.

It had been the practice of petitioner and his brother to have the partnership pay some of their personal bills and to charge the appropriate amount against their share of partnership income. In 1945, some $2,800 of the New York funds was used in that fashion to pay petitioner's personal bills. Four thousand dollars from those funds was used to repay a loan that had been made to the partnership, and $5,000 was used to buy stock in the name of the partnership. At the time, however, petitioner was not aware of the source of these monies.

With Abraham's consent, Schwartz had withdrawn about $25,000 from the New York accounts for his own use. He executed notes payable to the partnership and has been paying $100 weekly on those notes since about 1947, which amounts petitioner has accepted and entered in his books as "prepaid loans."

During the latter part of April, 1946, a special agent of the Internal Revenue Bureau informed Abraham of a proposed investigation of the firm's and the partners' income tax returns. On May 3 or 4, Abraham told petitioner that there were "implications" concerning the Goodwear Knitting Mills, that he had opened the New York accounts in order to keep the business going, and that he had loaned $25,000 to Schwartz. Until this disclosure, petitioner did not know of the existence of the New York accounts.

On the night of May 6, after receiving two extensions of time within which to submit the partnership books for examination by the Internal Revenue agents, Abraham destroyed all the partnership records except the general ledger for 1945. The next morning, after writing notes [2] to petitioner, Schwartz, and the investigating agents, he committed suicide.

The Commissioner, in reliance upon Section 182 of the Internal Revenue Code, 26 U.S.C. § 182, determined that all the money in the New York accounts represented partnership income and charged petitioner with one-half of that amount and assessed a 50 per cent fraud penalty. The deficiencies total about $180,000, plus substantial interest. The

2. "Dear Bon:
  It is a tough way to wind up our partnership and you are deserving of better.
  Your ill health and not being able to be as active as you might, gave me a free hand to do as I wished.
  The result is the examination of Goodwear transactions and possibly other implications which are not warranted.
  However I feel that I have been responsible for the aggravation you have had for the past 10 days, while you haven't complained, I know that it hurt.
  While I should be the last one to give advice, place the affairs with a good lawyer and it will be OK.
  I hope that my act won't be taken too hard by you, and tell Sadie that I am sorry—Kiss Rose and your kids for me.
                    Love
            [Signed] Abe"
"Dear Sam:
  Work with Bon and I am sure every thing will come out all right.

  I just couldn't bear to see you and Bon suffer through no fault of your own.
  What you did, you did to help the business and I hope it will come out all right.
                [Signed] Abe"
"Messrs Davis & Fisher:
  I am sorry to walk out on you this way and while I could take it, I felt that my brother, who had no part in it was simply going to get critically ill by the pressure which was being exerted and in which he was helpless, since he had practically no activity in the end of the business other than clerical work confined to the production of merchandise.
  As to the books and records I personally destroyed these, as I felt that any further examination was unwarranted on your part.
  Your prolonging your examination would lead nowhere except to kill by degrees my brother who is deserving of better than that.
                Sincerely,
          [Signed] Abe Stoumen"

Tax Court sustained the deficiency assessments but cancelled the fraud penalties, which holding the Commissioner does not question.

Petitioner's brief limits the area of dispute in the following manner. "Our attack on the decision of the Tax Court is based on its *conclusion*, and not on its *findings of primary facts * * *.*" (Italics in original.) Distilled to its essence, the case comes to this. Abraham, acting for the partnership through Schwartz, sold partnership property and received checks in payment which were deposited in the New York accounts, all of this being unknown to petitioner. Consequently, it is clear that the proceeds of the sales were realized by the partnership, thus becoming partnership income by virtue of Sections 183(a) and 22(a) of the Code.[3] Section 182(c) allocates to the partner his distributive share of the ordinary net income of the partnership, whether or not distributed to him.[4] Therefore, the conclusion is inevitable. Once the partnership realized income, petitioner became taxable upon his distributive share, whether or not it was distributed, and the fact that he knowingly received none of that income and was unaware of its existence until shortly before his brother's death is of no moment, taxwise. 26 U.S.C. § 182(c); U.S.Treas.Reg. 111, § 29.182–1, 26 Code Fed.Regs. § 29.182–1 (1949); Heiner v. Mellon, 1938, 304 U.S. 271, 58 S.Ct. 926, 82 L.Ed. 1337; Neil v. United States, 9 Cir., 1953, 205 F.2d 121, 126.

But, says petitioner, the New York accounts never got to the point of becoming partnership income. It is said that, conceding that the New York funds were the proceeds of the sale of partnership property, nevertheless, as a matter of law, those funds were not partnership income since they were the embezzled proceeds from the surreptitious sales of stolen partnership assets, embezzled and stolen by a disloyal partner by secret methods as part of a scheme to defraud petitioner. So phrased, that contention paints an appealing picture. The trouble is that it has absolutely no support in the record. First, the Tax Court found, quite correctly, that Abraham sold partnership property. Second, it was found that, in so doing, Abraham was acting on behalf of the partnership. It is on this point that petitioner departs from his previously quoted disclaimer and ignores the evidence, some of it his own. Petitioner testified that Abraham told him, just before the proposed investigation of the firm's books, that "* * * he had opened a couple of bank accounts in New York, in order to keep the business going; that he had to open these accounts." Abraham's suicide note to Schwartz contained the following statement: "What you did, you did to help the business * * *." Furthermore, Abraham's use of the traceable parts of the New York accounts supports the Tax Court's findings. That is, he used those funds to pay some of petitioner's personal bills, bought stock in the name

3. "Computation of partnership income

"(a) General rule. The net income of the partnership shall be computed in the same manner and on the same basis as in the case of an individual, except as provided in subsections (b), (c), and (d)." 26 U.S.C. § 183(a).

"Gross income

"(a) General definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *" 26 U.S.C. § 22(a).

4. "Tax of partners

"In computing the net income of each partner, he shall include, whether or not distribution is made to him—

* * * * * *

"(c) His distributive share of the ordinary net income or the ordinary net loss of the partnership, computed as provided in section 183(b)." 26 U.S.C. § 182(c).

of the partnership, repaid a loan made to the partnership, and accepted notes made out in favor of the partnership for the $25,000 loaned to Schwartz. A thief or embezzler is not likely to use the embezzled funds to pay personal bills of his victim or loan part of those funds and take notes payable to the victim. Consequently, Abraham's own statements, as testified to by petitioner and as contained in his suicide note, plus the manner in which he used the identifiable part of the New York funds, completely refute the contention that he was stealing partnership property or embezzling proceeds from the sale of that property. Finally, Abraham's destruction of the partnership records, in the words of the Tax Court, "* * * infers that they contained evidence that would have been useful to the Commissioner in establishing a direct connection of the bank accounts with the partnership, and hence gross income of the business." 2 Wigmore, Evidence § 291 (3d ed. 1940). This would be enough, but there is more.

Petitioner's entire case is based upon his wholly unsupported assertion that Abraham was off on a criminal frolic and was not acting for the partnership. Abraham, of course, is dead and cannot further clear up the matter. But Schwartz, who participated in all of Abraham's alleged machinations, was alive, available, and, in fact, was still employed by petitioner at the time of trial. Certainly, Schwartz could throw some light on the validity of petitioner's theory of the case. Yet petitioner did not call Schwartz. Indeed, the trial was adjourned at petitioner's request in order to afford him an opportunity to put Schwartz's testimony in the record, but petitioner declined to do so. From this failure to call Schwartz, the Tax Court inferred, as was clearly within its province, that his testimony would have been unfavorable to petitioner. Under the circumstances of this case, petitioner's neglect to call Schwartz "* * * becomes evidence of the most convincing character." Interstate Circuit v. United States, 1939, 306 U.S. 208, 226, 59 S.Ct.

467, 474, 83 L.Ed. 610; Wichita Terminal Elevator Co. v. Commissioner of Internal Revenue, 1946, 6 T.C. 1158, 1165, affirmed, 10 Cir., 1947, 162 F.2d 513; 2 Wigmore, op.cit. supra, § 285. Petitioner would avoid that unfavorable result by pointing out that it was the Commissioner who subpoenaed Schwartz but did not call him. The Commissioner might well have expected Schwartz to be hostile, while petitioner, who had the burden of proof on the issue, would have had every reason to expect Schwartz to be friendly and cooperative. Whatever may have motivated the Commissioner's decision not to call Schwartz need not concern us here, however, for the Commissioner made out his case without Schwartz. Petitioner was the one who needed Schwartz, not the Commissioner.

Petitioner did testify that Schwartz had told him that all the money and bonds that he had withdrawn from the New York accounts had been turned over to Abraham. This, we are told, shows that Abraham and not the partnership benefited, and, thus, Abraham realized income but the partnership did not. Even if Schwartz did turn the withdrawals over to Abraham, it does not follow that the latter converted or embezzled them. Petitioner showed no inordinate increase in Abraham's net worth. Indeed, his studied indifference as to what did become of the money from the New York accounts, considering the importance of the matter to him, was truly astounding. Furthermore, Schwartz was an employee and Abraham the managing partner. There is nothing sinister in an employee turning over to his employer money received from the sale of firm property. We may not assume that Abraham was an embezzler or a thief.

Petitioner overemphasizes the effect of his success in defeating the imposition of the fraud penalty. The fact that he was unaware of the New York funds, received none of them knowingly, and justifiably relied upon the information contained in the partnership books, was sufficient to show that, though false, his

returns were not filed with intent to evade the tax. That, however, has nothing to do with the operation of Section 182(c). By virtue of that section, one-half of the partnership's ordinary net income automatically became his income even though he actually received none of it knowingly and was ignorant of its existence at the time.

The judgment of the Tax Court will be affirmed.