(C.D. 4169)

NEW YORK MERCHANDISE CO., INC. *v.* UNITED STATES

</div>

United States Customs Court, First Division

(Decided January 29, 1971)

*Stein & Shostak* (*S. Richard Shostak* of counsel) for the plaintiff.
*L. Patrick Gray, III*, Assistant Attorney General (*Mollie Strum*, trial attorney), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This case involves the question as to the proper rate of duty on inflatable vinyl Santa Claus figures measuring 40 and 44 inches in height. The figures—which were imported from Taiwan via the port of Los Angeles in 1964—were classified by the government under item 737.40 of the Tariff Schedules of the United States as toy figures of animate objects and assessed duty of 35 percent. Plaintiff's claim is that the imported figures should be classified under item 772.97 as Christmas ornaments, dutiable at 17 percent.

The pertinent provisions of the tariff schedules are as follows:

Classified under

Schedule 7, Part 5, Subpart E

Subpart E headnotes:

 1. The articles described in the provisions of this subpart (except parts) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules * * *

  *  *  *  *  *  *  *

 2. For the purposes of the tariff schedules, a "toy" is any article chiefly used for the amusement of children or adults.

  *  *  *  *  *  *  *

Toy figures of animate objects (except dolls):
 Not having a spring mechanism:

  *  *  *  *  *  *  *

   Not stuffed:

  *  *  *  *  *  *  *

737.40     Other _____  35% ad val.

Claimed under

Schedule 7, Part 12, Subpart C

  *  *  *  *  *  *  *

Nativity scenes; Christmas ornaments; crucifixes; miniature altars, shrines, and holy-water fonts; religious figurines and statuettes; other religious articles; all the foregoing (not including any article provided for in part 6A of this schedule) of rubber or plastics:

  *  *  *  *  *  *  *

772.97   Other_____  17% ad val.

Essentially, plaintiff's argument is that the vinyl figures in issue are (i) chiefly used as Christmas ornaments and not for the amusement of children or adults; and (ii) that they are similar in all material respects to the vinyl Santa Claus figures involved in *Davis Products, Inc., et al.* v. *United States*, 59 Cust. Ct. 226, C.D. 3127 (1967), that were held to be properly classifiable (under the Tariff Act of 1930) not as toys (as assessed) but rather by similitude to manufactures of rubber (as claimed), on the basis that they were primarily constructed, marketed, sold and used as outdoor/indoor Christmas display decorations. The record in *Davis*, it may be added, has been incorporated in the record here.

It is against this background that we now review the relevant evidence in the present case. Plaintiff's first witness [1]—Max Fradkin, vice president of plaintiff-company—testified that he did not have an actual sample of the importations in question. In lieu thereof, a vinyl Santa Claus figure, measuring 48 inches in height, was received in evidence as plaintiff's exhibit 1. Plaintiff's exhibit 1, it is to be noted, is not the same size as the imported articles which (as previously indicated) measure 40 and 44 inches in height. The witness testified, however, that basically plaintiff's exhibit 1 was similar to the imported figures except for size and for the fact that the imported 44-inch figures in issue here had sandweighted feet.[2]

The witness also testified that the importations in issue constituted Christmas ornaments; that they were sold by plaintiff to chain stores and other retailers; and that in selling them to large customers which had more than one buyer, his company dealt with the Christmas decoration buyer and not the toy buyer. He further testified that the importations were displayed and sold with other Christmas decorations in plaintiff's showrooms in New York, Dallas, Portland and Los Angeles; and that they were displayed by plaintiff's customer-stores in the Los Angeles area with their Christmas decorations in the fall of the year and not with toys. He added that he himself had never seen the articles actually used by customers or seen them displayed other than in his company's showrooms and in the aforementioned stores in the Los Angeles area.

Plaintiff's second witness was Sidney L. Friedlander who had formerly been vice president of Davis Products, Inc. and had testified for it in the incorporated *Davis* case. In the *Davis* case, Friedlander testified that the imported vinyl Santa Claus figures there involved were introduced in the market to replace Christmas decorations composed of cardboard, wood, Masonite and other hardboard products; that the purpose of manufacturing the imported figures was to achieve a display article for outdoor as well as indoor use; that to this end, the vinyl used in the figures was 10 gauge—which, he said, was a heavier gauge than the 8 gauge usually found in the company's normal toy items; that the inflatable figures were of a lower temperature formulation to withstand cold-weather conditions; that the expressions of the figures, as well as their proportions, were done in a realistic manner; that each figure contained fastening tabs so that it could be nailed to the ground, roof, or floor; and that in his opinion the figures lacked cartoon and noisemaking features necessary in the design of toys.

---

[1] Defendant presented no testimony or exhibits.

[2] The witness explained that the presence of sand-weighted feet (1) gives the article more weight so that when placed outdoors it will stay put and not fly away; and (2) makes the figure more secure when placed indoors.

In the present case, Friedlander testified that he was in the Christmas decoration business until 1966 and was very active through 1964 but had no remaining interest in Davis Products or in anyone who was concerned or interested in the classification of inflatable figures. He stated that he had examined plaintiff's exhibit 1; that it was basically the same type of inflatable Santa Claus as the one involved in *Davis* "except somewhat different as to styling, slightly more cartoony than lifelike, which would be in keeping with the general trend in Christmas decorations that I personally observed"; and that it was slightly smaller than the Santa Claus figure involved in *Davis* and had minor construction differences.

Friedlander testified further that in the course of his occupation in the Christmas decoration business, he was familiar with items such as plaintiff's exhibit 1 in the present case because they were competitive items; that he saw those items displayed and sold; that there were no differences in the manner in which they were offered and sold and that Davis Products and plaintiff were in direct competition for the same customers; that in the course of his dealing in Christmas inflatable articles, he also saw inflatable items such as plaintiff's exhibit 1 used by consumers as outdoor/indoor displays in homes and that they were used in the same manner as the figures imported by Davis Products; that all this merchandise falls within a class of inflatable figures which constitutes Christmas decorations because its members are Christmas characters, are not salable and are not bought or sold at retail at any other time than during the Christmas season, and are sold to the same types of customers to whom the Davis Products inflatable Christmas ornaments were sold; and that this merchandise was always sold to Christmas decoration buyers.

On cross-examination, Friedlander testified that plaintiff's exhibit 1 was a Christmas decoration because it was a Christmas character; that most articles which depict a Christmas character would be excluded from being a toy; that smaller Santa Claus figures like plaintiff's exhibit 1, measuring 18 to 20 inches, are sold without tabs on the feet; that such smaller figures were used primarily in the windows of homes or on mantelpieces as decorations whether or not they had tabs; and that the primary difference between merchandise having and lacking tabs is that figures having tabs can be anchored to the rooftop or the ground by inserting thumbtacks or nails through the tabs.

Plaintiff's next witness, Leo Bronte, was manager of a Los Angeles company that sells articles like plaintiff's exhibit 1. He testified that he sells the articles, which are of 8½ mil gauge, to "trim-a-tree" companies which handle Christmas products such as trees, ornaments and decorations; that he did not deal with toy buyers in this type of merchandise; and that he had seen items like plaintiff's exhibit 1 used

locally as part of a display and not as a toy. He did not know the gauge of plaintiff's exhibit 1.

Bronte also testified that he sells smaller inflatable Santa Claus figures measuring 23 to 25 inches in height, and that such figures contain noisemakers so that the figure emits sound when squeezed or when activated by punching or pushing. He explained that the majority of producers include a noisemaker or squeaker in the smaller figures without the importer's asking for it. He added that almost every inflatable figure that he now gets contains a noisemaker in it; that some of the Santa Claus figures smaller than 48 inches have had noisemakers in them; and that some of his items have jingle bells that hang around the neck which chime out when moved. He added, however, that the figures he imports that are 48 inches or larger do not have a noisemaker or bell. In the witness' opinion, the presence of the noisemaker and/or bell did not change the merchandising channel of the merchandise or its use.

At the conclusion of Bronte's testimony, plaintiff recalled Friedlander to present further testimony regarding the presence of noisemakers in the Santa Claus figures. He stated that frequently in the Orient many smaller manufacturers automatically included such noisemakers in the Santa Claus figures. He did not know whether or not the importations involved in the present case had noisemakers in them.

In a different vein, Friedlander also testified that the general industry specifications on all inflatable Christmas articles are 8 or 8½ gauge vinyl regardless of size, save for the very large ones Davis Products imported that were specifically designed for rugged outdoor use, and hence were made of heavier material. In this connection, Friedlander (as previously noted) testified in the incorporated *Davis* case that the outdoor-indoor Christmas figures there involved were made of 10 gauge vinyl rather than the usual 8 gauge used in Davis' "normal toy items."

The record thus summarized shows that in the present case plaintiff has not produced a sample of the importations in question. It further shows that there are various differences between plaintiff's exhibit 1 and the actual importations. First, plaintiff's exhibit 1 is 48 inches in height, whereas the actual importations are 40 to 44 inches in height. Second, there is no indication in the record as to the gauge or thickness of the importations and whether the importations are flimsier than plaintiff's exhibit 1 or the importations involved in *Davis*. Third, the 44-inch imported figure—unlike plaintiff's exhibit 1 and the importations in *Davis*—had sand-weighted feet. Fourth, the record is devoid of evidence to show whether or not the importations

were or were not more "cartoony" than plaintiff's exhibit 1 or the figures involved in *Davis*.[3] Fifth, the record is entirely unclear as to whether or not the importations contained noisemakers. In this connection, it is to be noted that the witness Bronte testified that at least some inflatable figures less than 48 inches in height contained noisemakers. Further, when the witness Friedlander was recalled by plaintiff to testify on this matter, he stated that he did not know whether or not the actual importations contained noisemakers. In these circumstances, it is not without significance that plaintiff failed to recall Fradkin—the only witness in the case who testified about the actual importations—to explain whether or not the importations contained noisemakers.[4] The point is that without a sample of the actual imported articles and without adequate testimony in lieu thereof as to the presence of noisemakers in the imported articles, the strength of the plastic,[5] the significance of the sand-weighted feet and the presence of cartoon features, the court remains uninformed about various characteristics of the imported merchandise.[6] Nor are such characteristics inconsequential in determining whether the imported merchandise consists of toys, as the court made clear in *Davis*. Thus, in summarizing Friedlander's testimony in that case, the court included the following (59 Cust. Ct. at 228–29):

> * * * [I]n manufacturing the vinyl inflatables, the purpose was to achieve a display article for outdoor as well as indoor use. To this end, they are *constructed with a heavier gauge vinyl than usually found in the toy inflatables* that Davis also manufactures and imports. * * * The expressions of the figures, as well as their proportions, are done in a realistic manner, and each figure contains as an integral part fastening tabs enabling it to be nailed in place on the ground or floor or on the roofs of houses. * * *
>
> *     *     *     *     *     *     *
>
> Possessing a familiarity with Davis' toy line of products, the witness was of the opinion that the merchandise at bar lacked *cartoon* and *noise-making features* necessary in the design of toys. * * * [Emphasis added.]

Moreover, the presence of a noisemaker is of importance in determining whether an item is used for amusement as a plaything. For

---

[3] As previously noted, Friedlander testified that plaintiff's exhibit 1 was more "cartoony" than the figures in *Davis*—leaving open the question as to what the situation was with respect to the actual importations.

[4] The nonproduction of such evidence "permits the inference that its *tenor is unfavorable to the party's cause.*" II Wigmore *on Evidence* (3d ed. 1940) § 285, p. 162. See also e.g., *Stoumen* v. *Commissioner of Internal Revenue,* 208 F. 2d 903, 907 (3d Cir. 1953).

[5] The strength of the vinyl of the actual imported articles may be of importance considering that if a flimsy article is placed on a roof at Christmas time, it would be destroyed by the winds and/or snow of winter.

[6] See e.g., *Stern Bros* v. *United States,* 2 Ct. Cust. Appls. 405, 407, T.D. 32167 (1912) ; *United States* v. *Herrmann, et al.,* 154 Fed. 196, 13 Treas. Dec. 321, T.D. 27981 (1907). And see *United Purveyors, Inc.* v. *United States,* 65 Cust. Ct. 566, C.D. 4139 (1970).

example, in *Barum Co., Inc.* v. *United States*, 30 Cust. Ct. 414, 418, Abstract 57251 (1953), the court stated: "The metal whistle is an outstanding characteristic of each article [a soft rubber figure]. It enhances the value of the article as a toy * * *." In *B. Shackman & Co., et al.* v. *United States*, 31 Cust. Ct. 352, Abstract 57708 (1953), articles which had been classified as toys were claimed to be properly dutiable under an *eo nomine* provision for valentines. In overruling the protest and affirming the classification of the collector, the court held. "It should be observed that the construction of the sample, exhibit 1, *supra, particularly its noisemaking features*, lends support to the assessment of these articles as toys." *Id.* at 353, [Emphasis added in part.]

Plaintiff, however, insists that the imports are too large for children to hold or enjoy and thus cannot constitute toys. However, plastic articles 40 or 44 inches in height are not too large for children or adults to hold or enjoy. Indeed, we are all familiar with tall plastic toys which are weighted on the bottom in order that they may pop back to an erect position when pushed or punched by children or adults.

It is true that the evidence shows that the importations were sold to Christmas decoration buyers and not to toy buyers, and that they were displayed in Christmas decoration stores and departments. And we are quite mindful of what the court said on this score in *Davis* (59 Cust. Ct. at 230):

> * * * In selling these articles to department stores across the nation, the witness Friedlander always dealt with the Christmas decoration buyer, not the toy buyer. Although a merchandising medium may not *always* be a proper means of determining classification (cf. *United States* v. *Ignaz Strauss & Co., Inc.*, 37 CCPA 32, C.A.D. 415, cited by the defendant), sometimes, conversely, where merchandise is sold in stores having separate and distinct departments, a showing that certain articles are marketed through one department instead of another can have obvious probative value. *United States* v. *Brier Manufacturing Company*, 52 CCPA 35, 37, C.A.D. 854. In such a situation, whether merchandising follows use or use follows merchandising, the fact is that such a relationship can be normally inferred as an aid to the court's determination, unless the contrary is shown. Plaintiffs' exhibit 3, the advertising flier sent to actual customers and prospective customers, corroborates the foregoing evidence in that all of the protested items appearing thereon are offered as "Inflatable Christmas Decorations" for lawn or window use.

We find, however, that in this instance, the probative value attached to the method of merchandising in determining how the article was used is outweighed by other considerations. For on the present record,

in the absence of a sample or testimony in lieu thereof, we cannot determine whether the imported figures had noisemaking features, whether, because of the sand-weighted feet, the figures were capable of popping up when punched or pushed around, or were constructed of a light-weight vinyl suitable for toys, all of which have an important bearing in determining whether or not the product was chiefly used as a plaything. In view of these considerations, the fact that the articles were merchandised as Christmas decorations is insufficient in and of itself to establish that the articles are not toys. We note, too, that in *Davis* there was corroborating evidence to show that the articles were used as decorations rather than as toys. Here there is none. In fact, Fradkin, the only witness who testified regarding the actual imports, conceded that he had never seen the imported article used by a consumer. In short, we are unable to find, based on merchandising practices alone, a chief use that differs from the presumed use of the imported articles.

The protest is overruled and judgment will be entered accordingly.