Patrick B. Gonzalez and Margie O. Gonzalez v. Commissioner.
Gonzalez v. Commissioner
Docket No. 339-70.
United States Tax Court
T.C. Memo 1971-275; 1971 Tax Ct. Memo LEXIS 57; 30 T.C.M. (CCH) 1181; T.C.M. (RIA) 71275; October 28, 1971, Filed *57 Elwood Cluck, Alamo Nat'l Bank Bldg., San Antonio, Tex., for the petitioners. William T. Overton, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined a deficiency in petitioners' Federal income tax for 1966 in the amount of $6,231.82 and an addition to tax under section 6653(a) [1] in the amount of $311.59. The sole issue for decision is whether petitioners, in 1966, received income in the amount of $23,000 which they did not report in their Federal income tax return for that year. Findings of Fact Patrick B. Gonzalez (hereinafter referred to as Gonzalez) and Margie O. Gonzalez, husband and wife, were residents of San Antonio, Texas, at the time they filed their petition. They filed a joint Federal income tax return for 1966 with the district director of internal revenue, Austin, Texas. Gonzalez, after completing the sixth grade in school, joined the United States 1182 Marine Corps on January 26, 1954, and served for a period of 3 years. As a private he earned $94 per month, and later *58 as a corporal he earned $117 per month. While in the service he frequently engaged in dice games. After his discharge from the Marine Corps in January 1957, Gonzalez returned to San Antonio where, on November 25, 1957, he obtained employment as a bus driver for the San Antonio Transit System. In 1961, he was put on the "extra board," and by working from 10 to 16 hours a day and up to 6 days a week, he was able to earn about $6,500 a year. After working this schedule for about 2 years, he took a regular assignment from which he earned about $4,800 per year. When he returned to San Antonio, Gonzalez continued to participate in dice games, narrowly escaping arrest during a police raid early in 1960. During July of 1963, Gonzalez married. His wife was also employed and earned between $175 and $200 per month. In their income tax return for 1966, petitioners reported a total gross income from wages and salaries of $7,296.68, of which $4,808.86 was earned by Gonzalez. On July 18, 1966, petitioners purchased a $10,000 1-year certificate of deposit from the Highland Park State Bank; the funds could not be withdrawn during the following 1-year period. When the funds became withdrawable *59 in July 1967, petitioners used $3,500 of them to repay a loan obtained on April 19, 1967, and the remainder to purchase a new 1-year certificate in the amount of $6,500. Upon Gonzalez' declaration of hardship, the bank allowed him to withdraw the funds represented by the certificate on January 30, 1968; $1,000 was used to repay a loan obtained on September 19, 1967, and the balance, $5,555.19, was paid to petitioners. Also during 1966, petitioners deposited $13,000 in an account at the San Antonio Savings Association (hereinafter the Savings Association), $10,000 on February 7 and $3,000 on December 29. They made withdrawals from this account as follows: [2]
Date
Amount
Jan. 23, 1967
$13,000.00
Mar. 2, 1967
300.00
Mar. 14, 1967
100.00
July 28, 1967
195.73
Aug. 2, 1967
150.00
Sept. 5, 1967
50.00
The $13,000 withdrawn on January 23, 1967, was used to purchase a 6-month certificate of savings from the Savings Association. This certificate was surrendered on August 2, 1967. Of the proceeds, $1,000 was paid to petitioners and $12,000 was used to purchase a new certificate. This certificate was surrendered to the Savings Association on November 27, 1967, for *60 a new certificate in the amount of $7,000, a $1,034.38 savings account, and a $3,965.62 check. The $7,000 certificate was exchanged for cash on March 5, 1968, and petitioners made withdrawals from the savings account as follows: [3]
Date
Amount
Nov. 27, 1967
$500.00
Jan. 4, 1968
334.00
Jan. 18, 1968
125.00
Jan. 23, 1968
25.00
Mar. 5, 1968
52.38
When the Savings Association received the $10,000 currency deposit during 1966, it reported the deposit to the Treasury Department in accordance with established procedures. In due course, this report was turned over to the Internal Revenue Service, and a revenue agent was assigned to investigate it. During this investigation, the agent discovered the other deposit in the amount of $3,000 and the certificate of deposit in the *61 amount of $10,000 purchased from Highland Park State Bank. He also contacted petitioners and asked them to explain the source of the deposits. When they failed to satisfy him that the funds were derived from nontaxable sources, he recommended that the $23,000 in cash deposits be treated as additional income of petitioners for 1966. A deficiency notice was issued on that basis. Opinion In determining the deficiency here in dispute, respondent employed the bank deposits method of income reconstruction. This method "assumes" that all moneys deposited in a taxpayer's bank account, not found to have been derived from nontaxable sources, are taxable income. Price v. United States, 335 F. 2d 671, 677 (C.A. 5, 1964). It is well settled that "Where, as here, the records kept by the taxpayer are manifestly inaccurate or incomplete, the Commissioner may look to other sources of information to establish income, and may take into account, as 1183 prima facie evidence of income, bank deposits made by the taxpayer during the * * * [year] in question." Boyett v. Commissioner, 204 F. 2d 205, 208 (C.A. 5, 1953), affirming a Memorandum Opinion of this Court. Where *62 the bank deposits method has been used in the determination of taxable income, the burden rests with the taxpayer to show that the determination was inaccurate. Thomas B. Jones 29 T.C. 601, 614 (1957). To carry their burden, petitioners have relied exclusively upon Gonzalez' testimony. Accordingly to this testimony, the deposits comprising the $23,000 were derived primarily from funds accumulated by Gonzalez prior to 1960 and kept in "a secret place" until 1966. Supposedly he started to accumulate these funds in 1954 when he joined the Marine Corps. Not only does he claim to have saved almost his entire salary, but he assertedly acquired additional funds by gambling with loaded dice and by loaning money at usurious rates. The total amount allegedly accumulated during his 3 years in the Marine Corps was approximately $11,000, all of which was claimed to have been sent to his father for safekeeping. Upon being discharged from the Marine Corps in January of 1957, Gonzalez started to work as a bus driver. By working long hours of overtime, he was able to increase his basic salary of about $4,800 a year to approximately $6,500 a year for 2 years. According to Gonzalez, *63 he also continued to gamble until 1960 when he was so frightened by a police raid that he gave up all gambling activities. After allegedly saving the major portion of the $23,000 prior to the raid early in 1960, Gonzalez claims to have accumulated the balance by living frugally and retaining a substantial portion of his salary. When he married in 1963, Gonzalez' wife assertedly joined in his spartan life and aided in his savings program. We do not find this uncorroborated testimony sufficient to carry petitioners' burden of proof. First, it seems quite incredible that Gonzalez could have concealed his use of loaded dice from his fellow marines over a 3-year period, consistently winning substantial sums and regularly forwarding them (in $20 and $100 bills) to his father for safekeeping. In his dealings with the revenue agents during the course of the investigation of his returns, Gonzalez declined to give the agents his father's address so that they could interview him and verify his representations. At the trial, Gonzalez similarly failed to produce the testimony of his father to corroborate the story. Such testimony was peculiarly within his control, and his failure to produce it *64 can only lead to an inference that, if his father had testified, such testimony would have been unfavorable. O'Dwyer v. Commissioner, 266 F. 2d 575, 584 (C.A. 4, 1959), affirming 28 T.C. 698 (1957), certiorari denied 361 U.S. 862 (1959); Stoumen v. Commissioner, 208 F. 2d 903, 907 (C.A. 3, 1953), affirming a Memorandum Opinion of this Court. As to his nongambling income, we think it unlikely that Gonzalez was so frugal as to have saved any substantial part of the $23,000 in about 7 years (1954-1960) on a salary ranging from $1,128 to $4,800 per year and averaging only about $3,000 per year. Such an achievement is so foreign to everyday experience as to require extrinsic corroboration; none was produced; Gonzalez did not even introduce the testimony of his wife (one of the petitioners) who supposedly shared in his savings program after they were married. Moreover, an examination of the savings accounts opened by petitioners during 1966 shows that they were entirely dissipated by March of 1968. The withdrawals were not made all at once; rather they were made in odd amounts over a period of more than a year. Gonzalez was at times *65 so anxious to withdraw funds that he twice borrowed money at 7 percent interest which was repaid from the proceeds of certificates of deposit invested at 5 percent interest. Gonzalez did not even attempt to explain these withdrawals. Indeed, on cross-examination, he was completely unable to recall the purposes for which these "carefully saved" funds were expended, remembering only that little of the money remained. From a miser to a spendthrift is a change of character so drastic as to require explanation; none was offered. A further factor which causes us to question the reliability of Gonsalez' testimony is that it differs materially from statements he made at other times. At a conference with a member of the appellant staff of the Internal Revenue Service, Gonzalez stated that a portion of the deposited funds belonged to his brother-in-law. This statement is inconsistent with his statements to the revenue agent as well as the testimony presented to this Court. Yet the inconsistency remains unexplained. 1184 While we do not consider any one of the above factors alone to be conclusive, they each cast serious doubt upon the reliability of Gonzalez' testimony. Since that testimony *66 is the only evidence in petitioners' behalf, we are compelled to find that petitioners have failed to carry their burden of proof. Petitioners place great emphasis on the fact that the revenue agent, after contacting local and Federal law enforcement agencies, was unable to establish that Gonzalez was engaged in gambling activities during 1966. The agent's inquireies disclosed that there was no record of Gonzalez having been arrested for either a misdemeanor or a felony. From this petitioners would have us conclude that Gonzalez did not engage in gambling activities during 1966 and had no source of taxable income other than his salary in that year. However, we think petitioners read too much into the absence of a criminal record. The most we can conclude is that Gonzalez was not arrested. We do not think such evidence is sufficient to show that the unexplained deposits to petitioners' bank accounts during 1966 were not taxable income. [4]
*67 Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩
2. The difference of $795.73 between the total amount withdrawn ($13,795.73) and the amount deposited ($13,000) has not been explained; it is presumably, in part, interest. ↩
3. The difference of $2 between the amount withdrawn ($1,036.38) and the amount deposited ($1,034.38) has not been explained; it is presumably interest.↩
4. Petitioners have raised no separate argument with respect to the penalty determined under sec. 6653(a). We interpret this is a concession that the penalty applies to the extent that there is found to be a deficiency in the taxes owed, and we hold accordingly.↩