ROBERT M. SALLADAY and PATRICIA J. SALLADAY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Salladay v. Commissioner
Docket No. 16598-81.
United States Tax Court
T.C. Memo 1985-86; 1985 Tax Ct. Memo LEXIS 544; 49 T.C.M. (CCH) 827; T.C.M. (RIA) 85086; February 26, 1985. *544 Held:
(1) H and W failed to disprove the Commissioner's determination of unreported income in each of the years 1975 through 1978. (2) H and W are liable for the addition to tax for fraud under sec. 6653(b), I.R.C. 1954, for each of the years 1975 through 1978. Robert M. Salladay and Patricia J. Salladay, pro se. Thomas M. Rohall, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Additions to Tax
Sec. 6653(b)
Year
Deficiency
I.R.C. 1954 [1]
1975
$4,026.22
$2,013.11
1976
15,749.01
7,874.51
1977
7,090.23
3,545.12
1978
3,387.00
1,693.50
The issues for decision are: (1) Whether the petitioners understated their taxable income *545 in the amounts determined by the Commissioner during each of the taxable years 1975 through 1978; and (2) whether any part of the underpayment of tax for any of the taxable years 1975 through 1978 was due to fraud within the meaning of section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Robert and Patricia Salladay, husband and wife, resided in Sonora, Calif., at the time they filed their petition in this case. They filed their joint Federal income tax returns for 1975 through 1978 with the Internal Revenue Service Center, Ogden, Utah. Mr. Sallady personally prepared their returns for such years. From approximately 1972 until 1980, the petitioners were employed by the Grand Canyon Caverns, Inc. (the Caverns). The Caverns is a tourist facility located in a fairly remote area approximately 13 miles from Peach Springs, Ariz., and approximately 60 miles east of Kingman, Aria. During the years at issue, the Caverns operated a restaurant, a bar, a motel, and two gift shops. In addition, guided tours *546 were conducted by employees of the Caverns. The Caverns operated year round; however, its busy months were from the middle of June through Labor Day. During the years at issue, Mr. Salladay was the general manager of the Caverns, in charge of the entire operation, and Mrs. Salladay oversaw the two gift shops. The petitioners received salary checks twice a month. The other employees of the Caverns were also paid twice a month; however, they were usually paid in cash. The Caverns' business involved many cash transactions. The day's cash receipts were placed in a safe, and when there was sufficient cash, either the bookkeeper or Mr. Salladay took the money to a bank in Kingman. The cash deposit slips were prepared by the bookkeeper at the Caverns. Mr. Salladay, as general manager, was responsible for seeing that the cash deposits from the Caverns were deposited in the bank. Most of the merchandise sold in the gift shops consisted of souvenirs. The gift shops also sold some Indian jewelry. The Caverns usually purchased its Indian jewelry from salesmen who visited the Caverns, and it usually paid for the jewelry in cash. During the years at issue, the petitioners owned some *547 Indian jewelry and artifacts. During 1976, Mr. Salladay valued their jewelry and artifacts at $40,000 on a credit application. At the point where the guided tours began, there was a ticket machine, and there was a register tape which showed the number of people who had gone on the tours. During the summer months, Mr. Salladay personally checked out the guided tour operation at the end of each day. Mr. Salladay instructed the employees of the Caverns not to talk about how many people were visiting the Caverns, and he instructed one employee not to count the number of tickets purchased for the guided tours. Subsequently, the ticket-counting register was taped so that no one could see how many people had gone on the tours. For security reasons, the general manager who replaced Mr. Salladay also instructs his employees not to talk about the number of people taking the tours, and he sometimes also has taped up the ticket register. It is possible for someone to change the count on the ticket machine, and changing the count would not be difficult. The owners of the Caverns resided in or around Denver, Colo., and the books and records of the Caverns were kept in Denver. Twice a year, *548 the Caverns was audited by someone from the corporation's Denver office. The audits were internal and primarily for purposes of inventory control. During the years at issue, the petitioners maintained three savings accounts and one checking account at banks in Kingman. These accounts were the only bank accounts maintained by the petitioners during those years. The following table shows the opening balance and closing balance of such accounts during the years at issue: Account
Year
Opening Balance
Closing Balance
Valley National Bank of
1975
$275.57
$1,254.71
Arizona (checking)
1976
1,254.71
636.99
1977
636.99
145.73
1978
145.73
691.56
reat Western Bank
1975
(savings)
1976
1977
13,418.36
1978
13,418.36
Valley National Bank of
1975
21,321.21
40,000.00
Arizona (savings)
1976
40,000,00
40,502.08
1977
40,502.08
40,294.51
1978
40,294.51
41,224.69
First National Bank of
1975
190.00
Arizona (savings)
1976
190.00
37,868.64
1977
37,868.64
41,272.05
1978
41,272.05
21,622.11
The petitioners also maintained a safe deposit box at a bank in Kingman during the years at issue. During the period *549 from July through December 1976, Mr. Salladay entered the safe deposit box approximately three times a month. During the period from January through September 1978, he entered the safe deposit box approximately four times a month. From sometime prior to 1973 through 1978, the petitioners acquired the following assets: Date of
Method
Asset
Acquisition
of Payment
2 acres of real
Prior to 1973
Loan
property in Apache
Junction, Ariz.
1972 GMC pickup
1973
Bank loan
Erickson sailboat,
1973
Bank loan
trailer, and engine
Motor home
4/25/74
Bank loan
1975 GMC pickup
6/5/75
Bank loan
23-foot Ranger
7/8/76
Loan
sailboat
Sunfish sailboat
10/11/77
Cash
1978 GMC pickup
12/22/77
Bank loan
and Toyota
Landcruiser
1973 Jaguar
1977
Cash
Asset
Cost
Disposition
2 acres of real
Unknown
Loan paid
property in Apache
and property
Junction, Ariz.
sold in 1979
1972 GMC pickup
Unknown
Traded in on
purchase of
motor home
Erickson sailboat,
$9,801.00
Sold for
trailer, and engine
approximately
$11,500
in 1976
Motor home
$18,265.00
Sold for
(less $7,371
$14,100
trade-in
1/16/75
from 1972
GMC pickup)
1975 GMC pickup
$7,190.16
Traded in
on 1978
GMC pickup
and Toyota
Landcruiser
23-foot Ranger
$9,863.00
Sold in
sailboat
1979-1980
Sunfish sailboat
$1,369.00
Donated
to charity
in 1979-1980
1978 GMC pickup
$17,407.16
Sold in
and Toyota
1980
Landcruiser
1973 Jaguar
$6,000.00
Sold for
(and
$8,000.00
$2,500.00
in 2/79
for
repairs)
*550 The loans taken out to purchase these assets were the only loans taken out by the petitioners during this period. During 1976, the petitioners loaned E. C. Garth of Denver, Colo., $1,800, and during the same year, the loan was repaid. In 1978, a second loan was made by the petitioners to E. C. Garth in the amount of $18,000. No interest was charged on the loan, and it has not been repaid. During 1978, the petitioners made the following purchases of precious metals: Method
Metal Purchased
Date of
of Payment
Cost
Acquisition
3 bags of silver
3/8/78
Cashier's Check
$15,658.14
coins
21 Krugerrands
7/19/78
Cashier's Check
4,240.50
Two lots of
8/3/78
Cashier's Check
8,556.00
Krugerrands
During the years at issue, the petitioners did not have to pay for food or lodging since their employer provided food and lodging as a condition of their employment. Meals were provided for the petitioners by the restaurant located in the motel. Sometimes, they bought groceries and were reimbursed by their employer. The petitioners did not receive any gifts during the years 1975 through 1978. In approximately 1970, Mr. Salladay did receive *551 an inheritance from his mother valued at between $7,000 and $9,000. Part of such inheritance was received in cash, and the remainder consisted of a trailer, which he subsequently sold. This was the only inheritance that the petitioners received during the years 1970 through 1978. During the years at issue, the petitioners were not beneficiaries of any trust, and they were not involved in any partnership or corporation as officers. In addition, they never held anyone else's property in their names, nor was any of the petitioners' property held in the name of any other person. They never purchased any bonds, and they purchased only $500 worth of stock. From 1973 through 1978, Mrs. Salladay had an alcohol abuse problem. The IRS first commenced a criminal investigation of the petitioners; thereafter, the IRS also conducted a civil investigation of the petitioners. The petitioners were criminally investigated by Special Agent Allan Chitwood. Special Agent Chitwood interviewed Mr. Salladay during 1979, and he asked Mr. Salladay how much cash he had on hand as of January 1, 1974. Mr. Salladay told Agent Chitwood that he had no more than $2,000 at that time. He also told Agent *552 Chitwood that he had inherited between $7,000 and $9,000 from his mother in 1970. Mr. Salladay explained to Agent Chitwood that he had been able to accumulate funds over the past few years because his employer provided him with food and lodging. An attorney named John K. Ross of San Diego, Calif., represented the petitioners during 1979. Mr. Ross telephoned Agent Chitwood and told him that Mrs. Salladay had received between $30,000 and $40,000 from her mother 3 or 4 years earlier and that the money was kept under the Salladays' mattress. Revenue Agent William Keebler was assigned as a cooperating agent and examined the petitioners' income tax returns for the years 1975 through 1978. Agent Keebler never spoke to the petitioners, and they did not provide him with any books or records. He determined the petitioners' income by means of an indirect method, the source and application of funds method. Under such method, the agent attempts to identify all sources of funds and to determine the application of such funds. Any excess applications, without adequate explanation, are considered taxable income. Agent Keebler had previously used the source and application of funds method *553 approximately 40 or 50 times. In his investigation of the petitioners, Agent Keebler also did a bank deposits analysis. His investigation revealed substantial unexplained deposits into the petitioners' bank accounts. Most of the cash deposits were in the amount of $200, $300, $400, or $500. The deposits were spread out over the years 1975 through 1978; however, the deposits were concentrated in the period from March through October of each year. Agent Keebler's source and application of funds analysis revealed excess applications of $10,913 for 1975, $33,624 for 1976, $15,463 for 1977, and $8,583 for 1978. In his notice of deficiency, the Commissioner determined that the petitioners had underreported their gross income in each of the years 1975 through 1978 in the amounts determined in the source and application of funds analysis. The Commissioner also determined that the petitioners were liable for the addition to tax for fraud under section 6653(b) for each of the years 1975 through 1978. OPINION The first issue for decision is whether the petitioners understated their taxable income in the amount determined by the Commissioner during each of the taxable years 1975 through *554 1978. The petitioners do not contest the method used by the Commissioner to recompute their income. However, they do contend that they did not have any unreported income. They argue that they had a substantial amount of cash on hand during the years 1975 through 1978 which they claim had been given to Mrs. Salladay by her father in 1963. The Commissioner argues that the petitioners' cash hoard defense is so incredible as to be unworthy of belief. The petitioners have the burden of disproving the Commissioner's determination. Rule 142(a), Tax Court Rules of Practice and Procedure[2]; Welch v. Helvering,290 U.S. 111 (1933). In the present case, the petitioners rely solely on their claim of a substantial cash hoard to disprove the Commissioner's determination. According to their testimony at trial, Mrs. Salladay's father gave her $58,000 in Ireland in 1963 just prior to her emigration to the United States. Mrs. Salladay testified that the gift was in cash, in $100 bills, and was occasioned by her imminent departure and her father's poor health. The petitioners' claim is a *555 common one in cases of this type. In Holland v. United States,348 U.S. 121, 127 (1954), the Supreme Court referred to the claim of opening cash on hand as a "favorite defense." See also Friedberg v. United States,348 U.S. 142 (1954); Cefalu v. Commissioner,276 F.2d 122, 127 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Boyett v. Commissioner,204 F.2d 205 (5th Cir. 1953), affg. a Memorandum Opinion of this Court. However, the Supreme Court also recognized that "the correctness of the result depends entirely upon the inclusion in * * * [opening net worth] of all assets on hand at the outset." Holland v. United States,supra at 132. We must therefore never take lightly a taxpayer's contention with respect to an opening cash accumulation. The Commissioner argues that the only evidence supporting the petitioners' claim of a substantial cash hoard is their own uncorroborated testimony. He does not doubt that Mrs. Salladay did bring some money with her from Ireland when she emigrated to the United States in 1963. But, the Commissioner argues that the amount was nowhere near $58,000 *556 and that whatever money Mrs. Salladay brought with her was probably substantially depleted long before 1973. The Commissioner contends that the petitioners cash hoard story is a fairly recent fabrication and points out that there are a number of inconsistencies in the petitioners' testimony when compared to what they claimed on various occasions prior to trial. This Court is not bound to accept testimony at face value, even if uncontroverted, if it is inherently improbable or manifestly unreasonable. Quock Ting v. United States,140 U.S. 417, 420-421 (1891); Archer v. Commissioner,227 F.2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this Court; Boyett v. Commissioner,supra;Dougherty v. Commissioner,60 T.C. 917, 932-933 (1973). In the present case, the record is replete with inconsistencies which, when considered together, lead us to the conclusion that the petitioners have failed to prove that, at the beginning of 1975, they had the cash accumulation claimed by them. For the reasons set forth below, we sustain the Commissioner's determination of unreported income. During 1979, Mr. Salladay *557 was interviewed by Special Agent Chitwood. Agent Chitwood asked Mr. Salladay how much cash he had on hand as of January 1, 1974, and Mr. Salladay replied that he had no more than $2,000 at that time. The petitioners contend that Mr. Salladay understood Agent Chitwood's question to refer to him, individually, and not to refer to both himself and Mrs. Salladay. The petitioners' contention is unconvincing for a number of reasons. First, Agent Chitwood testified at trial that at the beginning of the interview he explained that his questions concerned both Mr. and Mrs. Salladay, and he further testified that it was his understanding that Mr. Salladay was answering for both himself and his wife. To show that Mr. Salladay had understood his question, Agent Chitwood testified that he also asked Mr. Salladay what were his sources of income during the years at issue and recounted that Mr. Salladay responded, "his wages, his wife's wages and his interest income from his various savings accounts." Second, Mr. Salladay testified that due to his wife's alcohol problem, he took over responsibility for the cash hoard in 1973. According to Mr. Salladay, during the years 1974 through 1978, he *558 kept the cash hoard in the freezer. It seems clear to us that Agent Chitwood's question to Mr. Salladay was understood by him to refer to both himself and Mrs. Salladay. Mr. Salladay also tried to explain his answer to Agent Chitwood's question by testifying that he lied to Agent Chitwood in order to keep his wife's alcoholism a secret. When questioned as to how Mrs. Salladay's illness explained why he told Agent Chitwood that he only had $2,000 in cash at the beginning of 1974, Mr. Salladay stated: "Well it was a mistake on my part of judgment, of how much is his business and how much is my business. Unfortunately, if turned out to be everybody's business." We do not find convincing any of Mr. Salladay's conflicting explanations concerning his answer to Agent Chitwood's question. In an application for credit dated September 13, 1976, Mr. Salladay listed $70,000 as "cash (on hand or in banks)." At that time, the petitioners had approximately $69,000 in their various bank accounts. The Commissioner argues that if the petitioners had had the cash hoard they now claim, surely the cash hoard would have been mentioned on the credit application. The petitioners attempt to explain *559 this inconsistency by arguing that "you borrow money, and expense out the interest and thereby retain your cash." Until marginal tax rates are 100 percent, the petitioners' argument does not make economic sense. [3] Nevertheless, Mr. Salladay's failure to list the cash hoard on a credit application in 1976 is only some evidence that the cash hoard did not exist. More damaging to the petitioners' case is Mr. Salladay's explanation concerning how he attempted to put the petitioners' cash hoard into circulation without attracting attention. Mr. Salladay testified that he took over responsibility for the cash hoard in 1973 and that sometime thereafter he became concerned that the money was losing its value and decided to start putting it into banks. When asked by the Commissioner's attorney why he deposited the money into a non-interest-bearing checking account in small amounts, $500, $400, $300 at a time, Mr. Salladay testified, "Well, at the time also, in my mind, I didn't want to drag attention to the money and have what's happening now happen, unfortunately." When asked who he was afraid might find out *560 about the fact that he had a large amount of cash, Mr. Salladay replied, "The Internal Revenue Service." If the petitioners' inheritance story were true, it would not have been necessary to so surreptitiously put the money into circulation. Finally, the petitioners' failure to call as witnesses at trial any member of Mrs. Salladay's family who might have confirmed her claim that her father gave her $58,000 in 1963 gives rise to the presumption that such testimony, if given, would have been unfavorable to the petitioners' case. Stoumen v. Commissioner,208 F.2d 903, 907 (3d Cir. 1953), affg. a Memorandum Opinion of this Court; Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). The petitioners contend that Mrs. Salladay's family did not know how much she received from her father. They also argue that they were never certain when the trial of their case would begin and that all the members of Mrs. Salladay's family were living in Europe "under different political systems" and it was difficult for them to come to the United States to testify. The Commissioner counters that although *561 members of Mrs. Salladay's family might not have known exactly how much she received from her father, they could have confirmed Mrs. Salladay's impression that gifts were given to family members. He further contends that members of Mrs. Salladay's family could have testified as to whether her father had sufficient financial means to have given his daughter $58,000. The Commissioner also points out that the petitioners were aware that the trial of their case would be held in San Francisco during the week of October 11, 1983, since as early as July 19, 1983, the date that this Court sent out the notice setting the case for trial. With respect to the petitioners' argument concerning the "different political systems" under which Mrs. Salladay's family lives in Europe, the Commissioner contends that Mrs. Salladay's family lives in Ireland, and although Ireland may have a different political system, the Commissioner does not believe that it would prevent members of Mrs. Salladay's family from coming to the United States to testify on her behalf. He also argues that members of Mrs. Salladay's family, living in Europe, were beyond the Court's process, and thus, only the petitioners could *562 have produced such witnesses. On the whole, we do not find convincing the petitioners' reasons for not having any member of Mrs. Salladay's family testify. It is obvious that members of Mrs. Salladay's family could have confirmed important aspects of her story. Furthermore, the petitioners were aware in July 1983 that their case was set for trial at the trial session beginning on October 11, 1983. We also do not find convincing the petitioners' assertions with respect to "different political systems." Although the record does not establish where, other than in Europe, Mrs. Salladay's family lived at the time of trial, the petitioners have made no effort to explain how "different political systems" prevented members of Mrs. Salladay's family from testifying at trial on her behalf. Having found the petitioners' contentions unconvincing, we sustain the Commissioner's determination of the deficiencies. The second issue for decision is whether the petitioners are liable under section 6653(b) for the addition to tax for fraud for each of the taxable years 1975 through 1978. Section 6653(b) provides that if any part of any underpayment of tax required to be shown on a return is *563 due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The Commissioner has the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b); Levinson v. United States,496 F.2d 651, 654-655 (3d Cir. 1974); Miller v. Commissioner,51 T.C. 915, 918 (1969). The Commissioner will carry his burden if he shows that the taxpayer intended to evade taxes which he knew or believed that he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 111-112 (1956). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed, but rather must *564 be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Circumstantial evidence is permitted where direct evidence of fraud is not available. Spies v. United States,317 U.S. 492, 499 (1943); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Gajewski v. Commissioner,67 T.C. at 200. Fraud may properly be inferred where an entire course of conduct establishes the necessary intent. Rowlee v. Commissioner,supra;Stone v. Commissioner,56 T.C. 213, 223-224 (1971). The precise amount of underpayment resulting from fraud need not be proved. Otsuki v. Commissioner,53 T.C. 96, 105 (1969). The statute requires only a showing that "any part" of an underpayment results from fraud. However, the Commissioner must show fraud resulting in an underpayment for each taxable year in issue. Otsuki v. Commissioner,supra.
In the present case, the evidence clearly establishes that the petitioners fraudulently underpaid their income tax during the years at issue. Mr. Salladay personally prepared the petitioners' income *565 tax returns for the years 1975 through 1978. Those returns understated taxable income by $10,913 in 1975, $33,624 in 1976, $15,463 in 1977, and $8,583 in 1978. Such a consistent pattern of underreporting substantial amounts of income, over a period of several years, standing alone, is persuasive evidence of fraud. Adler v. Commissioner,422 F.2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Estate of Upshaw v. Commissioner,416 F.2d 737, 741 (7th Cir. 1969), affg. on this issue a Memorandum Opinion of this Court; Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; see also Harper v. Commissioner,54 T.C. 1121, 1139 (1970), and cases cited therein. We fully recognize that such principle should be applied with caution where the finding of unreported income is based on a taxpayer's failure to meet his burden of proof. Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971); Otsuki v. Commissioner,53 T.C. at 106. However, our finding of fraud is not based on the petitioners' failure of proof. There is considerable *566 other evidence indicating that the petitioners intentionally understated their income and undertook a specific course of conduct with the intent to conceal such income, thereby evading the payment of taxes. We have rejected the petitioners' cash hoard defense for the reasons set out in our discussion of the first issue for decision. The petitioners' testimony with respect to their claimed cash hoard was riddled with inconsistencies and unworthy of belief. Such inconsistencies also support our conclusion that the petitioners intended to evade the payment of Federal income taxes which they knew that they owed. The Commissioner has endeavored to suggest two possible sources for the petitioners' unreported income. First, he argues that the petitioners were employed in a remote area in a business which was largely conducted on a cash basis and that financial controls were virtually nonexistent. Second, the Commissioner points to the fact that the petitioners owned a sizable amount of Indian jewelry which they could have sold. The petitioners argue that their honesty was never questioned by their employer, and they assert that although they listed a substantial amount of Indian jewelry *567 on a credit application, they in fact did not own more than a few thousand dollars worth of Indian Jewelry. In order to prove fraud, the Commissioner need not prove the actual source for unreported income. He may show a "likely" source of taxable income ( Holland v. United States,348 U.S. at 137-138), or he may negate sources of nontaxable income ( United States v. Massei,355 U.S. 595 (1958)). In the present case, the Commissioner has carried his burden in both respects. Mr. Salladay's conduct during the IRS investigation was clearly designed to mislead the Commissioner's agents and to conceal income, and such conduct strongly evidences an intent to fraudulently evade tax. United States v. Newman,468 F.2d 791, 794 (5th Cir. 1972); Gajewski v. Commissioner,67 T.C. at 200; McGee v. Commissioner,61 T.C. 249 (1973), affd. 519 F.2d 1121, 1126 (5th Cir. 1975). We have already discussed the inconsistencies in Mr. Salladay's explanations concerning why he told Special Agent Chitwood that he and his wife only had $2,000 in cash as of January 1, 1974. During his meeting with Agent Chitwood, *568 Mr. Salladay also attempted to mislead him by explaining that the petitioners had been able to accumulate funds because their employer provided them with food and lodging. There was a further attempt to mislead the Commissioner's agents when Mr. Ross, an attorney representing the petitioners, told Agent Chitwood that Mrs. Salladay had received between $30,000 and $40,000 from her mother 3 or 4 years earlier. Mr. Salladay contended that he did not authorize Mr. Ross' disclosure to Agent Chitwood, and he also contended that he was ill advised and poorly served by Mr. Ross. Once again, the petitioners have provided an explanation for the conflicts in their testimony, but not a convincing explanation. Finally, it is evident from the record before us that the petitioners' cash hoard story is a fairly recent fabrication. The petitioners argue that their petition, filed on July 6, 1981, informed the Commissioner of their cash hoard defense. The petition states: "Petitioner Patricia J. Salladay, prior to emigrating to the United States from Dublin, Ireland, received monetary gifts from her father and brought these funds with her to the United States in May, 1963." The petitioners also *569 argue that another attorney who represented them informed an IRS appeals officer of their cash hoard claim in early 1982. However, the attorney testified at trial and was unable to recall whether in 1982 he told the IRS that the petitioners had a cash hoard in any specific amount. It is obvious that the petitioners' petition contained no details with respect to their cash hoard defense. Indeed, the petitioners' claim of a $58,000 inheritance conglicts with the claim in their reply, filed on November 20, 1981, that Mrs. Salladay inherited $60,000 in 1963. Clearly, the petitioners' cash hoard story evolved to fit the facts uncovered by the Commissioner as the petitioners became aware of what his investigations had disclosed. The petitioners' conduct reveals a pattern of furtive behavior designed to conceal their receipt of taxable income and hence avoid the payment of taxes which they knew to be owing. Their substantial underreporting of income, their failure to offer any plausible explanation for such underreporting, and their deceptive conduct throughout the investigation and at trial, all clearly demonstrate that the underpayments of tax were due to fraud. Consequently, we *570 hold that the Commissioner has proven, by clear and convincing evidence, that some part of the underpayment of tax for each year was due to fraud within the meaning of section 6653(b). Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.↩
3. See Phillips v. Commissioner,T.C. Memo. 1984-133↩.