(C.D. 4246)

MEGO CORP. v. UNITED STATES

United States Customs Court, First Division

(Decided August 9, 1971)

*Allerton deC. Tompkins* for the plaintiff.

*L. Patrick Gray, III*, Assistant Attorney General (*Velta A. Melnbrencis*, trial attorney), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This case concerns the proper dutiable status of an importation in 1966 from Hong Kong via the port of New York of articles invoiced as target game sets. The sets were classified by the government under item 737.90 of the tariff schedules as toys, not specially provided for, and assessed duty of 35 percent.[1]

Plaintiff has protested and claims the imports are properly classifiable under item 734.15 as darts and other games played on boards of special design, dutiable at 20 percent. Alternatively, it claims the imports should be classified under the provisions of item 735.20, either as game equipment or sports equipment also at a duty rate of 20 percent.

In other words, plaintiff is alternatively claiming that the imported sets are classifiable as (1) games played on boards of special design; (2) game equipment; (3) darts; or (4) sports equipment. We overrule the protest without affirming the government's classification.

The pertinent portions of the tariff provisions and the related headnotes read as follows:

---

[1] More particularly, the government classified the imported sets under item 737.90 as toys, *other than those having a spring mechanism* rather than under item 737.80 covering toys *having a spring mechanism*. However, it is undisputed from an examination of the record and the sample that the sets have spring mechanisms. Hence, the classification was obviously in error.

Classified under:

Schedule 7, Part 5, Subpart E

Subpart E headnotes:

1. The articles described in the provisions of this subpart (except parts) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules, but the provisions of this subpart do not apply to—

\*    \*    \*    \*    \*    \*    \*

    (iii) games and other articles in items 734.15 and 734.20, toy balls, (items 735.09–.12) and puzzles and games in item 735.20 (see part 5D of this schedule).

2. For the purposes of the tariff schedules, a "toy" is any article chiefly used for the amusement of children or adults.

\*    \*    \*    \*    \*    \*    \*

Toys, and parts of toys, not specially provided for:

| | | |
|---|---|---|
| 737.80 | Toys having a spring mechanism_____ | 44% ad val. |
| 737.90 | Other_____ | 35% ad val. |

Claimed under:

Schedule 7, Part 5, Subpart D

Subpart D headnotes:

1. This subpart covers equipment designed for indoor or outdoor games, sports, gymnastics, or athletics * * *.

\*    \*    \*    \*    \*    \*    \*

| | | |
|---|---|---|
| 734.15 | Chess, checkers, pachisi, backgammon, darts and other games played on boards of special design, all the foregoing games and parts thereof (including their boards); mah-jong, and dominoes; any of the foregoing games in combination with each other, or with other games, packaged together as a unit in immediate containers of a type used in retail sales; poker chips and dice_____ | 20% ad val. |
| 735.20 | Puzzles; game, sport, gymnastic, athletic, or playground equipment; all the foregoing, and parts thereof, not specially provided for_____ | 20% ad val. |

Each imported set consists of a pair of plastic guns; four plastic "darts" each of which is tipped with a rubber suction cup to enable it to stick to a flat surface when propelled by the pistol; three small roly-poly clown targets; and a plastic target board with concentric scoring rings marked 25 and 50 and a bull's-eye marked 100. The set comes in a see-through display package that bears the caption "TARGET GUN SET WITH 2 TARGET GUNS, 4 RUBBER TIP DARTS, 3 ROLY-POLY TARGETS and TARGET BOARD." Each pistol contains a gun sight and a spring trigger mechanism. The rubber-tipped dart is inserted into the pistol and held by an automatic holding mechanism. When the trigger of the pistol is squeezed, a spring is activated which propels the dart toward the target.

One witness testified at the trial—the vice president of plaintiff Mego Corporation. He stated that plaintiff designs, creates, imports and distributes toys which are sold throughout the United States. In 1966 the witness was the toy buyer for plaintiff and helped to design and create the imported product here in issue. As part of its development, the witness and three other company buyers practiced and played with the product in their offices here and overseas to make sure it worked properly. Additionally, the product was tested by employees' children to make sure it would not cause injury.

In plaintiff's business, the witness testified, toys are broken down into 13 major classifications (e.g. boys' friction toys, non-friction toys, educational toys, dolls, plush toys, infant toys, musical toys, games, puzzles, sporting goods and miscellaneous). Plaintiff's "game classification," he stated, "covers all products that children can use in competition with one another" and in 90 percent of the instances, these "games" require the feature of competitiveness. The witness testified that the imported merchandise was in the company's "game classification."

He stated further that the importation is a "copy down" of an English dart game consisting of a dart board and six metal-tipped darts with sharp points, weighted at the front end and feathered at the back. The English dart game, he said, is played by throwing the darts at the dart board and adding up the points assigned to the sector where the dart pierces the board.

According to the witness, the target board in the present imported set is designed to keep score and is thumbtacked on a wall. As previously noted, the rubber-tipped dart is inserted into the pistol and held by an automatic holding mechanism until released by the trigger. The witness stated that the target board is placed at a distance of 10 to 20 feet from the participant who aims the gun at the target and attempts to hit it with the dart. He said that the one who scores the most points on the board is the winner. The witness further testified that the

importation comes without any rules, and that the children have the opportunity of making whatever rules they want to win. The imported set, he indicated, was designed for two or more children, and was not designed to be used individually. Although the darts and the pistols in the set were designed to be used with each other, the witness stated that children can and apparently do throw the darts around, as well as use them as an extension of their hands. He added that children "can fantasize this as a gun and go bang-bang with it."

Continuing, the witness said that the importations as a whole were designed for an age group of from 4 to 10 years. However, he stated that four-year olds cannot add sums of 25, 50 and 100, so that the target board would be of no use to them in scoring.

The witness conceded that the suction rubber-tipped end of the dart does not fit within the ring of the target board marked 50 or within the ring marked 25 but rather overlaps those rings. The witness hypothesized, however, that children "fantasize" and adjust to this situation by scoring the ring in which the greatest portion of the suction cup lies.

The witness noted that the imported set comes with three roly-poly clowns at which a child could shoot. These targets, the witness stated, were included to add additional action for the toy and to enhance the design but were not its "chief value." In this connection, his attention was directed to an advertisement on the package of the set illustrating one child shooting a pistol at the roly-poly clown target and another child shooting at the target board.

Finally, the witness testified that approximately 3,500 to 4,000 dozen target gun sets have been imported and that there are many similar items on the market. The witness stated that he himself had observed this type of merchandise used outside of his office on three or four occasions, i.e. in people's homes.

Against this factual background, plaintiff has raised three issues for our consideration: (1) whether the importation is classifiable as a game or game equipment under the tariff schedules; (2) whether the importation is classifiable as "darts" under the tariff schedules; and (3) whether the importation is classifiable as sports equipment under the tariff schedules. We now consider these issues seriatim.

Whether The Importation Is Classifiable As a Game or Game Equipment. At the outset, it is to be observed that headnote 1(iii) of schedule 7, part 5, subpart E (previously quoted) provides that an article which is both a toy and a game (or game equipment) is classifiable under the provisions for games (or game equipment) rather than under the provision for toys. However, plaintiff must of course establish that the imported sets possess the attributes of a game in order to succeed in its claim for their classification as other games played on boards

of special design (item 734.15) or as game equipment (item 735.20).[2] And in determining whether the target gun sets here in issue possess such attributes, we refer to the following dictionary definitions of the term "game" as set out in *Montgomery Ward & Co.* v. *United States,* 66 Cust. Ct. 233, C.D. 4195 (1971) :

*Funk & Wagnalls New Standard Dictionary of the English Language* (1952) :

game, n. 1. A contest for recreation or amusement, to be won by chance, skill or endurance, or by any or all combined; also, a particular kind of such contest, or the method or art employed in it; as, a *game* of dominoes; baseball has been called the American *game.*

The expression *games of chance* is used to describe those contests the outcome of which is largely governed by chance, as in cards, dice, and gambling games generally, and in opposition to *games of skill* the result of which depends largely upon the dexterity of the contestant.

*Britannica World Language Dictionary,* Vol. 1 (1963) :

game n. 1 Any contest undertaken for recreation or prizes, played according to rules, and depending on strength, skill, or luck to win. * * * 7 A set of equipment used in playing certain games, as backgammon or darts.* * *

*Webster's Third New International Dictionary, Unabridged* (1963) :

game 1a(1) : An amusement or pastime : DIVERSION, PLAY [children at their *games*] * * * (2) : the equipment used to play a game [what *games* will you bring the children for Christmas] * * * 3a(1) : a physical or mental competition conducted according to rules in which the participants play in direct opposition to each other, each side striving to win and to keep the other side from doing so * * * d : a contest, rivalry, or struggle of any kind * * *

    *       *       *       *       *       *       *

game of chance : a game (as a dice game) in which chance rather than skill determines the outcome
game of skill : a game (as chess) in which skill rather than chance determines the outcome

Thus, the common meaning of the term "game" for tariff purposes refers to a competition or contest which involves skill, chance or endurance or any combination of these three elements, and which is played according to rules with the objective of winning.

Against this background, the present record fails to establish that the importations are games within the common meaning of the term, for the following cumulative reasons:

1. There are no rules for playing with the present importations— the children make up whatever rules they want.

2. The record shows that the pistols are used by children not only to project the darts at the target board to score, but also to project the darts at the clown targets. Further, the pistols are played with as make-believe guns and the darts are also used by children to throw around. Thus, the imported sets are not limited by their design and construction to use in a competition or contest.

---

[2] It is clear that game equipment is that equipment used in the playing of a game. See *e.g. Border Brokerage Co., Inc.* v. *United States,* 64 Cust. Ct. 446, C.D. 4017 (1970). Put otherwise, in order to be classified as game equipment, the equipment must be used in an activity which is within the common meaning of the term "game."

3. The younger children in the group (ages 4 to 10) for whom the importations were designed cannot add numbers such as 25, 50 and 100 and, therefore, are incapable of keeping score. Accordingly, for this group at least, the element of competitiveness required to classify a toy as a game is absent.

4. The evidence establishes that the darts have suction cups which are wider than the scoring zones of the target board and which as a result overlap the scoring zones. In that circumstance, when the darts are projected on the target, accurate scoring is impossible and only estimated scores can be rendered through guesswork.

5. There has been no showing nor do the samples indicate that chance, skill or endurance are elements involved in the use of the importation. In this connection, the samples demonstrate not only that the pistols are extremely inaccurate but that the darts fail to stick to the target board with any frequency [3] and are incapable of sticking to the roly-poly clowns.

6. With regard to plaintiff's claim that the importation is classifiable under item 734.15 as other games played on boards of special design, *Border Brokerage Co., Inc.* v. *United States, supra,* 64 Cust. Ct. 446, 448, C.D. 4017 (1970), establishes that this item "include[s] only games which require a specially designed board on which the game is actually played and without which the game could not be played." Reviewing the evidence in the present case, we note that the importations have specially advertised alternative "targets," consisting of roly-poly clowns in addition to the target board. This consideration, together with the absence of rules, the inability of the younger children for whom the sets were designed to add the scores, and the inability to compute accurate scores due to the oversized rubber suction cups on the end of the darts, would indicate that the importation does not have those characteristics required for classification under item 734.15.

As a further aspect, it is clear that the game provisions in subpart D are use provisions—which means that the articles must be chiefly used as games in order to be so classified. See e.g. *Western Importing Company* v. *United States,* 62 Cust. Ct. 231, 234, C.D. 3734, 297 F. Supp. 181, 183–4 (1969). Thus, it was incumbent upon plaintiff to establish that the imports were chiefly used as games. This plaintiff has not done. In the first place, the qualifications of plaintiff's witness to testify as to the chief use of the product was greatly limited by the following facts: (i) the witness had no firsthand knowledge as to use of the import by consumers; and (ii) the witness' own use of

---

[3] The witness indicated that the suction cups failed to stick to the target board on the basis that the rubber tips were four years old and had therefore lost resiliency. We do not regard this explanation as particularly convincing.

the product was of little value in establishing chief use since the item was designed for children of from 4 to 10 years of age, and presumably used by such children. Nor can the testimony of plaintiff's witness to the effect that children compete to keep score be given great weight in view of his limited exposure to the import's use. Furthermore, the witness' observations as to the actual use of the import were restricted to use by members of his office staff testing the article for specific qualities; by children in the importer's office under controlled conditions; and by children on three or four occasions in people's homes. With 3,500 to 4,000 dozen articles imported, this evidence, even under the most favorable interpretation, cannot be considered as such positive testimony representative of an adequate territorial area across the United States which is required for the purposes of establishing chief use. E.g. *L. Tobert Co., Inc., et al.* v. *United States*, 41 CCPA 161, C.A.D. 544 (1953).

It is true that the court can take judicial notice of chief use of an article in instances where there can be no dispute among reasonable men. E.g. *Tanross Supply Co., Inc.* v. *United States*, 58 CCPA 26, C.A.D. 1000 (1970). It is also true that there are situations where the particular character and special design of the article limits it to one sole and exclusive use which can be considered its chief use. E.g. *John V. Carr & Son, Inc.* v. *United States*, 65 Cust. Ct. 301, C.D. 4092 (1970); *Montgomery Ward & Co.* v. *United States, supra*, 66 Cust. Ct. at 238. But this is not the situation here. For here, examination of the sample does not permit drawing of the inference that the imported set is chiefly used as a game. Cf. e.g. *Wilson's Customs Clearance, Inc.* v. *United States*, 59 Cust. Ct. 36, C.D. 3061 (1967). Indeed, examination of the sample, without more, would tend to indicate that the darts in conjunction with the pistols are equally designed for aiming not only at the target board but at any other object including the roly-poly clowns. The fact is that there is nothing inherent in the target set which limits its use to that of a game as opposed to its use merely as a toy. This is to say that the import is not of a type limited by its peculiar design or construction to one use, i.e. as a game. We are mindful that the record shows that the imported sets have been placed by plaintiff in its toy-game classification. But this consideration cannot command great weight when it is considered that at least 10 percent of the articles in plaintiff's toy-game category do not have the element of competitiveness—a feature necessary for an article to be considered a "game."

Quite distinguishable is *Montgomery Ward & Co.* v. *United States, supra*, 66 Cust. Ct. 233, C.D. 4195 (1971). Involved in that case were so-called "Mother Hen Target Game Sets" which consisted of a board with an egg-shaped target, a spring-activated gun with three rubber-

tipped plastic darts (similar to the gun and darts here), and four round plastic eggs. When the target was hit, a bell would ring and a round plastic "egg" would drop into a basket. There were specific rules for playing the target game which were printed on the reverse side of the target board. The court in finding that the importations were properly classifiable as game equipment under the provisions of item 735.20 stated that (66 Cust. Ct. at 238):

> * * * [T]hese activities are games since they result in a "score" measuring one's skill or luck or combination thereof against a given set of rules. It is in this light that examination of the sample, including the instructions, makes it apparent that the importation in question—which is played in a manner very analogous to darts—is by its nature a game. Indeed, there can be no conceivable use for it other than as a game.

In the present case, by contrast, there are no rules or instructions directed towards hitting the target board. Indeed, the rubber-tipped "darts" are designed to be shot either at the target board or at the roly-poly clowns. Moreover, no skill or dexterity is involved. Absent too is real competition involving scoring since the younger users of the imports are incapable of adding the numbers of the board, plus the fact that the large size of the suction cups requires guesswork in place of accurate scoring. Further, unlike the situation in *Montgomery Ward*, the record here shows that the sets can be and are used by children in many ways other than as a game.

Whether The Imported Sets Are Classifiable As Darts. We turn now to plaintiff's claim that the imports are classifiable as "darts" within the meaning of item 734.15. The following lexicographic definitions of "darts" are pertinent:

> *Webster's Third New International Dictionary, Unabridged* (1963):
>
> dart—1 * * * c: a small missile usu. with a shaft pointed and weighted at one end and feathered on the other (as one used in a blowgun or one thrown by hand at a target in the game of darts) * * *.
>
> darts * * *: a game in which darts are thrown at a target and scored according to their nearness to the bull's-eye.
>
> *Encyclopaedia Britannica*, Volume 7, p. 82 (1969 edition):
>
> DARTS, a predominantly British game played by throwing darts at a circular numbered board. The board, usually of cork, bristle, or elm, is divided by thin wires into 20 sectors, valued at points ranging from 1 to 20. A narrow outer ring running through all sectors doubles the value of the sector for the dart thrown into that part of the sector and a narrow inner ring trebles it, while the bull's-eye itself has a small outer ring worth 25, the inner circle being worth 50 points (*see* figure). Throwing is free style from

8 to 9 ft. away, with the centre of the board 5 ft. 8 in. from the ground.

Each player has three darts, generally about 6 in. long, weighted and feathered. The usual game is to start with any double score (dart thrown into the double ring) and then subtract this and subsequent scores from 301. The winner must reach exactly zero with a final double. Variations of the game are limited only by the player's imagination.

\* \* \* In its modern form the game is played in the public house (tavern) or club, rather than the home. At the beginning of the 1960s there were estimated to be about 6,000,000 players in the British Isles, of whom 1,000,000 were registered players, organized into 7,000 clubs affiliated with the National Darts Association. \* \* \*

Thus, the game of darts as it is commonly known is played with small missiles with metal pointed shafts, weighted at the front end and feathered at the other end, which are thrown at circular dart boards of special design—numbered in an intricate and particular way—upon which the game is scored.

In this context, the imported sets do not qualify as "darts" for the following reasons: In the first place, there is nothing in the record to show that the import was ever known, sold, used or referred to as darts; in actuality, they are advertised and invoiced as target games or sets and not as darts. The mere fact that the rubber-tipped missiles are referred to as "darts" by the importer does not mean that the entire importation constitutes the game of darts for tariff purposes. Second, the actual game of darts is played by throwing specially designed missiles against a specially designed board and computing the score at the point of impact where the tip of the dart pierces the board. The game is played in actual competition, involves skill, and scoring is of major importance. By way of contrast, the darts in the imported set are not similar to those found in the actual game. They are not thrown but shot from toy guns; they have no pointed tips but rubber-suctioned cups at the end which, as we have seen, overlap the score zones thus affording only guesswork at scoring. And the four-year olds, part of the group for whom the set was designed, cannot even add the scores on the board. Further, as previously shown, skill is not a factor in the use of the set. An additional consideration is that the game of darts is played on a board of special design which board is a necessary requisite of the game. *Border Brokerage Co., Inc.* v. *United States, supra,* 64 Cust. Ct. 448. Here, however, the importation affords the child the option of shooting at the roly-poly clowns rather than the target board and thus the board is not a necessary element of the game. Finally, even assuming the imports possessed some of the elements of "darts," the presence of the pistols and the roly-poly clowns renders

them more than darts. See e.g. *Cragstan Corporation* v. *United States*, 51 CCPA 27, C.A.D. 832 (1963).

Whether The Imported Sets Are Classifiable as Sports Equipment.

As previously discussed, headnote 1(iii) does *not* exempt sports equipment from the pervasive character of the toy provisions covered by that subpart.[4] Therefore, in order to be successful in its claim that the importation is sports equipment, plaintiff had the burden of showing not only that the imported set is not a toy (i.e., it is not chiefly used for the amusement of children or adults), but also that it falls within the category of sports equipment. Plaintiff has failed in both regards. For one thing, there is no evidence to show that the merchandise is not chiefly used for the amusement of children. Further, there is no proof that the import consists of sports equipment. In this connection, the *Tariff Classification Study*, Schedule 7, (1960), pp. 287–91, indicates that only that sports equipment used in the serious pursuit of a sport is to be covered by the provisions for such sports equipment. Sports equipment for children, though diminutive in size, would only be classified as such if it was of a character suitable for organized play. See *New York Merchandise Co.* v. *United States*, 62 Cust. Ct. 38, C.D. 3671, 294 F. Supp. 971 (1969). There is nothing in the record to show that the importation possesses such characteristics. In fact, the flimsy character of the importation, coupled with its dissimilarity to the adult game of darts, militates against finding that it consists of sports equipment (even assuming that darts is a sport and not a game).

On the basis of the foregoing, we conclude that the importations are properly classifiable as toys having a spring mechanism. We therefore overrule the protest without affirming the government's classification of the importations as toys other than those having a spring mechanism.

Judgment will issue accordingly.

---

[4] In this regard, plaintiff argues that all the equipment covered by item 735.20 (i.e., game, sport, athletic and playground equipment) consists of "games" as that term is used in headnote 1(iii). Thus, it claims that the headnote refers to all equipment provided for under item 735.20. However, it is clear that there can be sports, gymnastic, athletic and playground equipment which would not be considered a "game" for tariff purposes. Furthermore, if it were the intent of Congress to provide in headnote 1(iii) for all equipment covered by item 735.20, the language would have read "Puzzles and other articles in item 735.20," and thus be similar to the language in the headnote pertaining to "games and other articles in items 734.15 and 734.20."