**MEGO CORP.**

v.

**UNITED STATES.**

C.D. 4574; Court Nos. 70/62273, etc.

United States Customs Court.
Dec. 19, 1974.

Allerton deC. Tompkins, Staten Island, N.Y., for plaintiff.

Carla A. Hills, Asst. Atty. Gen. (Steven P. Florsheim, New York City, trial atty.), for defendant.

MALETZ, Judge:

The problem in this consolidated action concerns the proper tariff classification of merchandise invoiced as "Baseball Game" that was exported from Hong Kong and entered at the port of New York in August and October 1969. The merchandise was classified by the government under item 737.90 of the tariff schedules, as other toys, not specially provided for, and assessed duty at the modified rate of 28 percent ad valorem.[1] The government claims alternatively that the merchandise is classifiable under item 737.80, as toys, not specially provided for, having a spring mechanism, and thus dutiable at the modified rate of 33 percent ad valorem.

Plaintiff claims alternatively that the imported merchandise is properly classifiable (1) under item 735.20, as game or sport equipment, dutiable at the modified rate of 16 percent ad valorem; or (2) under item 734.20, as game machines, dutiable at the modified rate of 8 percent ad valorem; or (3) under item

---

[1]. The modified rates specified here and hereafter were effected by Pres.Proc. 3622, T.D. 68–9.

734.56, as other baseball equipment, dutiable at the modified rate of 12 percent.

The pertinent provisions of the tariff schedules read as follows:

*Classified under*:

*Subpart E [Part 5, Schedule 7] headnotes*:

1. The articles described in the provisions of this subpart (except parts) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules, but the provisions of this subpart do not apply to—

\* \* \* \* \* \* \* \*

(iii) games and other articles in items 734.15 and 734.20, toy balls (items 735.09–.12), and puzzles and games in item 735.20 (see part 5D of this schedule).

2. For the purposes of the tariff schedules, a "*toy*" is any article chiefly used for the amusement of children or adults.

\* \* \* \* \* \* \* \*

Toys, and parts of toys, not specially provided for:

\* \* \* \* \* \* \* \*

737.90      Other .............................. 28% ad val.

*Alternative classification claimed by government*:

Toys, and parts of toys, not specially provided for:

737.80      Toys having a spring mechanism ....... 33% ad val.

*Classification claimed by plaintiff [Subpart D, Part 5, Schedule 7]*:

735.20      Puzzles; game, sport, gymnastic, athletic, or playground equipment; all the foregoing, and parts thereof, not specially provided for ........................... 16% ad val.[2]

*Alternative classification claimed by plaintiff*:

734.20      Game machines, including coin or disc operated game machines and including games having mechanical controls for manipulating the action, and parts thereof ....... 8% ad val.

*Alternative classification claimed by plaintiff*:

Baseball equipment and parts thereof:

\* \* \* \* \* \* \* \*

734.56      Other .............................. 12% ad val.

---

2. In paragraph 10 of its complaint, plaintiff also claimed alternatively that the imported merchandise consisted of gymnastic, athletic, or playground equipment within the meaning of item 735.20. However, plaintiff, in its brief, has not set forth any argument in support of these claims and they are therefore deemed abandoned.

## I

The imported merchandise consists of (1) a device which projects balls by means of a mechanism having a battery operated, coil-spring controlled pitching arm; (2) a set of eight small plastic, hollow balls, each approximately one and one half inches in diameter; and (3) a plastic, hollow telescoping bat, which, when extended to its full length, is 25 inches long. The projecting device has a rack for holding the balls which is designed to deliver the balls one-at-a-time to the pitching arm. In turn, the pitching arm is designed to propel the balls one-at-a-time to a batter standing (with the bat) a few yards from the mechanism. The pitching arm may be adjusted by placing a key attached to the coil spring into one of a number of slots thereby changing the tension on the arm and controlling the height and speed at which the ball is propelled.

The device contains an on-off electric switch connected to the battery. When the switch is turned on, the battery supplies power to a motor which activates a lever that revolves and activates the spring controlled pitching arm, which then propels each ball at constant time intervals to a distance of some 20 feet. About eight second elapse between the time the switch is turned on and the first ball projected, which is sufficient time to enable the user to turn on the device and then move to the batter position.

As imported, the merchandise was packed in a carton on which was printed the following:

Professional
HOME RUN
Adjustable Pitching Machine

BE A REAL SLUGGER—PRACTICE AT HOME

* Automatic Delivery
* Adjustable Pitching Height For All Ages
* Safe Non-Toxic Plastic Bat and Balls

    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

FUN FOR EVERYONE

———————

Also, as imported, the carton contained an instruction sheet which set forth instructions on assembly and use of the merchandise and also described how one or more persons "can play baseball" therewith. This instruction sheet read as follows:

The "HOME RUN BASEBALL GAME" by Mego is designed to operate in the same manner as the famous "IRON MIKE" Pitching Machine used by the Major League Baseball Clubs. To operate simply insert D battery in the direction as indicated and close door. Take the ball chute and insert the pin into the machine and take the chute holder and insert into the holes as indicated in *figure* A and rest chute in brackets. Insert key on lower end of the spring into the slots provided on the bottom of machine. By moving the key into the different slots you can adjust the height and speed of the pitch. Put balls into the chute and turn the switch on. If the machine does not start immediately, push on gently toward the back of the machine, machine will now operate correctly.

To open bat, grasp both ends and pull outwards with twisting motion. You are now ready to play baseball.

### GAMES

One of the ideal features of the "HOME RUN BASEBALL GAME" is that one person can play baseball. Set-up the machine at an appropriate

distance and mark off on the wall at 2 foot intervals, single, double, triple and home-run. Turn on the machine, the balls that hit before the wall are out. Any balls above the first line is a single, above the second a double and so on. This way you can enjoy batting practice.

For 2 people, one bats and one fields alternatively, this makes it much more difficult to score runs.

For 3 or more players, use the machine as the pitcher and position the players as you would any normal baseball game. Children of different ages can play together since the machine can be adjusted to the appropriate height and speed.

NOW LETS PLAY BALL!

The imported merchandise was designed for boys in the seven to twelve age bracket; was sold at retail for about $7.00; and was advertised in plaintiff's catalogue as "Action Toys." It was patterned after the "Iron Mike" which is a baseball pitching machine that will throw a baseball 60 feet at different speeds and is used by baseball teams, and at batting ranges, for batting practice.

The nature of the merchandise is such that it can be operated and used by a single person. In this connection, a single person will load the ball rack with balls and turn the projecting device on. The time lag between the projections of the balls allows the person to take a batting stance at the appropriate distance and position from the device and attempt to hit the projected balls with the bat. Once all the balls have been projected, the person shuts off the device and the process can be repeated. However, the merchandise *can* be used by more than one person, such as in a game of "single, double, triple." [3]

II

At the trial, two witnesses testified for plaintiff, while defendant failed to call any witnesses. Plaintiff's first witness, Neal Kublan, director of creative projects for plaintiff, testified that the imported article acts as a substitute pitcher and was designed to teach a young boy how to hit a ball. He added that he knew of no other use for the article other than pitching a ball. The witness further testified that the vast majority of his observations as to the use of the article were made in retail sales demonstrations in stores in various parts of the United States where children would be afforded the opportunity to hit a few balls. Also, Kublan stated that at one time he was co-manager of a Little League team and used the article in the basement of a school to teach the children on the team how to hit. In addition, he testified that the article was used in plaintiff's offices by plaintiff's employees to play "single, double, triple," and that the most experience he personally had with the article was using it in conjunction with friends or children to play this game.

Plaintiff's second witness, Martin Abrams, the president of plaintiff, testified that the article was developed from the "Iron Mike," and that he had seen it used throughout the United States about fifty to a hundred times over a four-year period. More particularly, he stated that he had seen it used in demonstrations in retail stores; on location at a baseball field in Florida where plaintiff had some six children participate in the filming of a TV commercial of the article; and in friends' homes about five to six times in 1969 and about the same number of times in 1970. He further indicated that he had played with it in the office in the manner indicated by the previous witness. On the basis of his observations, he stated that the article was used extensively by persons for

3. In this game, one or more persons field, one or more persons bat, and the article acts as the pitcher. If the batter hits the ball past the pitcher, it is a single, double, triple or home run depending upon the height. However, if a fielder catches the ball on the fly, it's an out.

competitive purposes to refine their skill and do better than the next person and was also used "occasionally" for noncompetitive purposes. The witness concluded that the article was not chiefly used to teach batting, but rather was chiefly used as a game in a competitive atmosphere. He further stated that even were it to be assumed that the chief use of the article is for teaching, it would still be a game. Thus he testified (R. 99):

> Even assuming that it was to teach them, it would still constitute a game.
>
> \* \* \* \* \* \*
>
> Because within the frame of reference, it's teaching them how to play a game. It's teaching them a skill to perfect which falls within a "game" premise.

### III

We turn now to plaintiff's claims that the merchandise is properly classifiable under item 735.20 as "game equipment" or under item 734.20 as "game machines." As to these claims, it is to be noted that headnote 1(iii) of schedule 7, part 5, subpart E (previously quoted) provides that an article which is both a toy and a game or game equipment is classifiable under the provisions for games or game equipment rather than under the provisions for toys. Thus the key question with respect to these claims by plaintiff is whether the merchandise in issue is a "game" regardless of whether it is also a toy. See e. g., Mego Corp. v. United States, 62 CCPA ——, ——, C.A.D. 1137, 505 F.2d 1288 (1974); Montgomery Ward & Co. v. United States, 66 Cust.Ct. 233, 234 (1971).[4]

"The common meaning of the term 'game' for tariff purposes refers to a competition or contest which involves skill, chance or endurance or any combination of these three elements, and

which is played according to rules with the objective of winning." Mego Corp. v. United States, 67 Cust.Ct. 19, 24, C.D. 4246 (1971). See also e. g., Mego Corp. v. United States, supra, C.A.D. 1137, 505 F.2d at 1291. Further, as this court stated in Montgomery Ward, supra, 66 Cust.Ct. at 238:

> \* \* \* Of course, a game is necessarily a contest, but one which may be between two or more persons, or between one person and the game itself. For example, a slot machine can only be played by one person at a time \* \* \*. A pinball machine can only be played by one person at a time and is a contest between man and machine which involves an element of skill, while the slot machine is essentially a game of chance. Darts can be played or practiced by one person alone simply as a test of skill of the player, with no necessity for an opposing player. All the above are "games" or "game machines" within the provisions for "games and sporting goods" in schedule 7, part 5, subpart D of the tariff schedules, and do not necessarily involve more than one person in their playing. The point is that these activities are games since they result in a "score" measuring one's skill or luck or combination thereof against a given set of rules.

Beyond this, it is important to observe that our appellate court recently held that items 734.20 and 735.20— which cover, among other things, game machines and game equipment—are not "chief use" provisions. Mego Corp. v. United States, supra, C.A.D. 1137, 505 F.2d at 1292. Instructive in this regard are the following comments in the Tariff Classification Study (Schedule 7, 1960), pp. 287–288:

> The classification problems connected with sports equipment and *games* and *game* equipment which may be

---

4. As the court pointed out in *Montgomery Ward, supra* at 236: "[U]nder the tariff schedules, all games and game equipment are now provided for in schedule 7, part 5, sub-part D—the congressional intent being to remove all games, including 'toy games,' from the toy provisions."

chiefly used for the amusement of children are particularly troublesome. * * * The earlier provisions of this subpart discussed above for equipment for various games such as baseball, croquet, and golf, are derived principally from tariff paragraph 1502, and it is intended that the equipment which would be classified thereunder would be of such character and quality *as is ordinarily used* in the serious pursuit of the game or sport named. Such equipment may be diminutive in size for use by children, such as a boy's baseball glove, but it would nevertheless be classified under these provisions so long as it was of a character *suitable for use* in organized play of these games. * * * [Emphasis added.]

■ Measured by these standards, it must be concluded that the imported article is not a game. For one thing, examination of the article, without more, establishes that by its design and construction it is not directed to a contest or competition. *Cf.* Mego Corp. v. United States, *supra,* C.A.D. 1137, 505 F.2d at 1291. The record shows that the function of the article is to pitch a ball and to enable the batter to hit the ball so pitched. Thus, there is nothing inherent in the article which restricts its ordinary use to that of a game. Moreover, there are no specific rules for play; rather, the user can make up whatever rules he wants. See e. g., R. 80–81. It is true that an instruction sheet comes with the merchandise. But this instruction sheet merely suggests how one or more persons "can play baseball" therewith. Nor is the merchandise limited in its design and construction to use in a competition or contest. For it can be, and was in fact, used by individual persons for batting of balls and for batting practice, and the balls can be used separately for most any play activity limited only by the imagination of a child.

■ Plaintiff, however, argues that an article used in perfecting one's ability to play a game, i. e., batting practice, is game equipment for tariff purposes. I cannot agree. A game machine, or game equipment, must be of such character and quality as is ordinarily used in the pursuit of the game or sport as opposed to preparing or practicing therefor. Hence, if an article is not ordinarily used in a contest, or in competition, it is not a game, notwithstanding that the elements of skill and/or endurance and/or chance might be involved. The short of the matter is that the mere batting of balls, or batting practice, simply does not involve the element of competition. What is more, the fact that a child may compete with himself, in training for a given game, by seeing how many times, or how far, or how high, he can hit a ball does not convert the imported merchandise into a game any more than a top would be converted into a game by virtue of a child competing with himself in seeing how long he can cause the top to spin.

On a related aspect, it is true that the imported article *can* be used for playing a game. But this consideration is scarcely decisive. For innumerable articles can be and are used by children (and adults) for playing games, notwithstanding that by no stretch of the imagination are they considered games. To take an extreme example, pennies are often used by children (and adults) in a game called "pitching pennies" where the winner is the one who pitches his penny closest to the wall. Despite the fact that pennies are used for this purpose, it would strain all credulity to consider them as games.

For the foregoing reasons, it is held that the articles in question are not "games" for tariff purposes and, accordingly, plaintiff's claims for classification under item 735.20 as "game equipment" or under item 734.20 as "game machines" are overruled.

## IV

■ We come now to plaintiff's claims that the imported merchandise is properly classifiable under item 735.20 as sport equipment or under item 734.56

as other baseball equipment. In considering these claims, it is to be noted that headnote 1(iii) of schedule 7, part 5, subpart E does *not* exempt sport equipment or baseball equipment from the pervasive character of the toy provisions covered by that subpart. See Mego Corp. v. United States, *supra*, 67 Cust. Ct. at 29. Therefore, in order to be successful in its claims that the importation is sport or baseball equipment, plaintiff must not only overcome the presumption of correctness attendant upon the government's classification of the importation as a toy, it must also establish that the importation falls within the category of sport or baseball equipment. *Ibid.* Plaintiff has failed in both regards.

For one thing, it is clear on the basis of the present record that plaintiff has failed to overcome the presumption that the importation is a toy (i. e., an article chiefly used for amusement purposes). In fact, the record supports the presumption. First, an examination of the merchandise shows that it is a plaything used for amusement purposes and that the fun that children would derive from using the merchandise is essentially the same kind of enjoyment they would derive from any other objects which are commonly thought of as toys. See United States v. Topps Chewing Gum, Inc., 58 CCPA 157, 159, C.A.D. 1022, 440 F. 2d 1384, 1385 (1971). Second, in their testimony both of plaintiff's witnesses characterized the importation as a "toy." See R. 37, 119, 120, 151. Indeed, plaintiff's witness Abrams, the president of the plaintiff-corporation, readily conceded that the merchandise was an article of "amusement." See R. 123–125. Third, plaintiff advertised and offered the merchandise in its catalogue as an "Action Toy."

Bearing mention on this phase is New York Merchandise Co., Inc. v. United States, 62 Cust.Ct. 38, C.D. 3671, 294 F. Supp. 971 (1969). There it was held that a "junior edition" of a baseball glove was properly classifiable as baseball equipment because it was of such character and quality as to be suitable for use by children in a regular or organized game of baseball. As the court stated (62 Cust.Ct. at 44, 294 F.Supp. at 976): "Those children who cannot afford the more costly baseball gloves can still successfully engage in a baseball game using the gloves in issue." In short, the only real difference between the "junior edition" involved therein, and the type of baseball gloves used by adults, was the size and the quality of the materials from which it was made.

By contrast, in the present case, the imported merchandise is incapable of use in a game of baseball.[5]

Thus, as plaintiff's witness Kublan testified, neither the bat nor the balls can be used in a regular game of baseball, and because of weight and size of the ball, a pitcher would be unable to pitch it to the home plate on a regular sized diamond. See R. 74–76, 83. Moreover, the "Iron Mike," which the imported merchandise is patterned after, is not used in the game of baseball, the human pitcher of a nine member team having yet to be replaced by a machine. However, assuming *arguendo* that an "Iron Mike" is baseball equipment for tariff purposes, the legislative history discussed at length in *New York Merchandise, supra*, 62 Cust.Ct. at 43–44, 294 F. Supp. at 975–976, reveals the intent of the Congress to have imitations of sports equipment, made for small children, classified as toys and not as sport or baseball equipment. The imported merchandise falls precisely within this category for it is nothing more than a toy imitation of an "Iron Mike."

---

5. *Baseball* is defined by Webster's Third New International Dictionary, Unabridged (1963), as:
   A game played with a ball, bat, and gloves between 2 teams of 9 players each on a large field centering upon 4 bases that form the corners of a square 90 feet on each side, each team having a turn at bat and in the field during each of the 9 innings that constitute a normal game, the winner being the team that scores the most runs.

It may be that the imported merchandise can be used to improve one's skill in the actual game of baseball. But not every object or device that might improve one's skill in a given sport is, *ipso facto,* sport equipment. For example, a broom stick could be used to bat small rubber balls, yet, quite obviously, it is not baseball or sport equipment. By the same token, an ordinary length of rope could be used by a boxer to improve his skills, yet it could hardly be argued that a length of rope is sport equipment.

From what has been said, it is concluded that plaintiff's claims for classification of the imported merchandise as sport equipment under item 735.20 or as baseball equipment under item 734.56 must be overruled.

## V

In summary, the court overrules plaintiff's alternative claims for classification of the imported articles (1) as game or sport equipment under item 735.20; (2) as game machines under item 734.20; and (3) as baseball equipment under item 734.56. Judgment will be entered accordingly.[6]

---

6. It will be recalled that the government classified the imported merchandise under item 737.90, as other toys, not specially provided for, and assessed duty at the rate of *28 percent* ad valorem. It will also be recalled that the government claims alternatively that the merchandise is classifiable under item 737.80, as toys, not specially provided for, having a spring mechanism, and thus dutiable at the rate of *33 percent* ad valorem. In considering this alternative claim, it must be borne in mind that in a case such as the present where the importer brings suit, this court may not render an affirmative judgment for a rate of duty higher than that assessed. See, e. g., J. E. Bernard & Co., Inc. v. United States, 64 Cust.Ct. 525, 527, C.D. 4029 (1970), appeal dismissed, 58 CCPA 165 (1970). Accordingly, the court deems it appropriate in the circumstances of this case to pretermit the question as to whether or not the imported articles are properly dutiable under item 737.80, as toys having a spring mechanism.